[No. A125937. First Dist., Div. Three. Dec. 9, 2010.]

MENTAL HEALTH ASSOCIATION IN CALIFORNIA et al., Plaintiffs and Appellants, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents.

COUNSEL

Howard Rice Nemerovski Canady Falk & Rabkin, Steven L. Mayer; Disability Rights California, Daniel Brzovic, Andrew Mudryk, Sean Rashkis; Western Center On Law & Poverty, Inc., Kimberly Lewis, Richard A. Rothschild, Jennifer A. Flory; Mental Health Advocacy Services, James Preis; National Center For Youth Law and Patrick Gardner for Plaintiffs And Appellants.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Karin S. Schwartz, Julie Weng-Gutierrez, Niromi W. Pfeiffer and Sarah E. Kurtz, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**POLLAK, Acting P. J.**—Several organizations dedicated to providing advocacy, education and support services in the field of mental health[1] and several individuals who have been recipients of assistance from the former Homeless Adults Program, appeal from the denial of their petition for a writ of mandate to compel the State of California[2] to reinstitute that program. Appellants contend that the removal from the state's budget of funding for the Homeless Adults Program, which occurred as the result of a gubernatorial veto in 2007, violates the provisions of the Mental Health Services Act (MHSA), which was approved by the voters as Proposition 63 on the November 2004 ballot. That measure imposed a new tax to fund the expansion of mental health services and added to the Welfare and Institutions Code[3] section 5891 which, as originally enacted, reads as follows: "The funding established pursuant to this act shall be utilized to expand mental health services. These funds shall not be used to supplant existing state or county funds utilized to provide mental health services. *The state shall continue to provide financial support for mental health programs with not less than the same entitlements, amounts of allocations from the General Fund and formula distributions of dedicated funds as provided in the last fiscal year which ended prior to the effective date of this act. The state shall not make any change to the structure of financing mental health services, which increases a county's share of costs or financial risk for mental health services unless the state includes adequate*

---

[1] These appellants are the Mental Health Association in California, the California Network of Mental Health Clients, and the National Alliance on Mental Illness California.

[2] The respondents are Arnold Schwarzenegger, as Governor, the State Department of Mental Health, and Stephen W. Mayberg, as Director of the State Department of Mental Health. In referring to the contentions of the respondents, we shall refer to the respondents collectively as the Department.

[3] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

*funding to fully compensate for such increased costs or financial risk.* These funds shall only be used to pay for the programs authorized in Section 5892. These funds may not be used to pay for any other program. These funds may not be loaned to the state General Fund or any other fund of the state, or a county general fund or any other county fund for any purpose other than those authorized by Section 5892." (Italics added.)[4] We conclude that the trial court correctly determined that termination of the Homeless Adults Program violated neither the "funding requirement" nor the "structure requirement" of section 5891.

## Background

The Homeless Adults Program began in 1999 as a three-county demonstration project to provide extended community mental health services and outreach to mentally ill adults who were homeless or at risk of homelessness. (Stats. 1999, ch. 617, § 1, p. 4345.) The Director of the State Department of Mental Health (the Department) was directed to devise a methodology for awarding grants to counties consistent with the priorities set forth in the legislation. (See §§ 5814, subd. (a)(2), 5802.) These projects were considered highly successful and the following year Assembly Bill No. 2034 (1999–2000 Reg. Sess.) (Assembly Bill 2034) was enacted providing additional funding to expand to additional counties what became known as the "AB 2034 program." (See Stats. 2000, ch. 518, § 1; § 5814.) As the trial court found, "It is not disputed that, since its inception the AB 2034 program has been a tremendously valuable and effective program addressing the needs of homeless adults who suffer mental illness."[5]

---

[4] In 2008, this provision became subdivision (a) of section 5891 when the statute was amended to add a subdivision (b), the provisions of which are not pertinent to the present controversy. (Stats. 2008, ch. 751, § 73.)

[5] According to a report submitted by the Department to the Legislature in May 2003, as of January 31, 2003, 4,881 individuals with serious mental illness were being served in 35 programs. "The success of local programs in helping individuals move from homelessness to community housing situations is one way that this demonstration program has broken new ground. As in previous years, evaluation data continue to show dramatic reductions in the number of days of incarceration and inpatient psychiatric hospitalization experienced by individuals in this program. And, for the first time, the data reflect significant increases in the number of persons involved in employment activities. . . . [¶] The results document not only the personal success of clients, but the ongoing cost effectiveness of AB 2034 programs." The Governor's Budget Summary for 2004–2005 states, "The Governor's Budget continues funding of $54.9 million General Fund for the Integrated Services for Homeless Adults program, which has a proven track record of success in treating and providing services to the mentally ill. Additionally, evaluations have shown that this program leads to significant savings at the local level, and continuing this program provides essential fiscal relief to counties in these difficult times." A report dated June 21–23, 2006, entitled Drafting California's Ten-Year Chronic Homelessness Action Plan reported that "[a]t the height of the program, AB 2034 funds were serving over 4,500 mentally ill homeless or incarcerated individuals . . . through 53

In November 2004, the voters passed Proposition 63, enacting the MHSA, adding numerous provisions to the Welfare and Institutions Code and the Revenue and Taxation Code.[6] As summarized by the Legislative Analyst in the official voter information guide, the proposition "establishes a state personal income tax surcharge of 1 percent on taxpayers with annual taxable incomes of more than $1 million. Funds resulting from the surcharge would be used to expand county mental health programs. [¶] . . . [¶] . . . The proposition specifies that the revenues generated from the tax surcharge must be used to expand mental health services and could not be used for other purposes. In addition, the state and counties would be prohibited from redirecting funds now used for mental health services to other purposes. The state would specifically be barred from reducing General Fund support, entitlements to services, and formula distributions of funds now dedicated for mental health services below the levels provided in 2003–04." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) analysis of Prop. 63 by Legis. Analyst, p. 34.) The measure created a Mental Health Services Fund to be administered by the Department, into which funds generated by the new tax surcharge were to be deposited and "all moneys in the fund are continuously appropriated to the department, without regard to fiscal years, for the purpose of funding" programs authorized by the act. (§ 5890, subd. (a).)

Following passage of the MHSA, in July 2005, the Department adopted a "County Non-Supplantation policy" to implement the statute. In a letter directed to all local mental health directors and others, the Department advised that "county non-supplanting under the MHSA consists of three requirements, all of which must be met in order for an expenditure to be eligible for reimbursement under the MHSA." The policy requires that funds be used for programs authorized in section 5892, that funds not "be used to replace other state or county funds required to be used to provide mental health services in fiscal year 2004–2005 (the time of enactment of the MHSA)," and that funds "be used on programs that were not in existence in the county at the time of enactment of the MHSA (new programs) or to expand the capacity of existing services that were being provided at the time of enactment of the MHSA (11/2/04)." The letter further advised that the policy "does not preclude a county from ceasing to fund programs that no longer meet the needs of the county and its stakeholders as long as the aggregate state and county funds required to be used to provide mental health services are used for such purpose." Also, the Department "does not intend to

programs operating in 34 counties throughout California. . . . [¶] . . . [¶] . . . The AB 2034 programs were very effective at serving a variety of consumer needs," but "improvement was needed in the level of participant retention" and in "outreach" to the Hispanic community.

[6] The various provisions of the MHSA are found at sections 5771.1, 5813.5, 5820 et seq., 5830 et seq., 5840 et seq., 5845 et seq., 5878.1 et seq., 5890 et seq., and 18257, and at Revenue and Taxation Code sections 17043, 19602, and 19602.5.

change the structure of mental health financing which would increase a county's share of cost or financial risk for mental health services." The Department subsequently promulgated regulations implementing the MHSA which include the nonsupplantation requirements. (Cal. Code Regs., tit. 9, § 3410.) When additional MHSA funds have become available for distribution to the counties, the Department has reiterated the need to comply with the nonsupplantation policy.

In 2003–2004, the Department's budget included $557,948,000 in state General Fund monies dedicated to local assistance for mental health services, including administrative costs. This amount included funds for numerous categories of programs and services, including the Early Mental Health Initiative, community services—other treatment, children's mental health services, AIDS programs, Healthy Families programs, managed care, services for brain damaged adults, and Medicaid Early and Periodic Screening, Diagnosis and Treatment (EPSDT) benefits. In 2006–2007, the Department's budget for these and other new county mental health services was $740,069,000, and in 2007–2008, the fiscal year in which this action was filed, $741,444,000.

The AB 2034 program continued until August 2007, when the Governor exercised line-item veto authority to delete from the 2007–2008 budget the $54.85 million that the Legislature had included for this program. The Governor's explanation for the deletion read as follows: "I am deleting the $54,850,000 legislative augmentation for the Integrated Services for Homeless Adults with Serious Mental Illness Program. While I support the goals of the program, this reduction is necessary to limit program expansions and to help bring ongoing expenditures in line with existing resources. To the extent counties find this program beneficial and cost-effective, it can be restructured to meet the needs of each county's homeless population using other county funding sources, such as federal funds, realignment funds, or Proposition 63 funds."

## Analysis

### 1. *Standard of Review*

Appellants contend that the trial court erred in denying their petition for a writ of mandate under Code of Civil Procedure section 1085. To obtain such relief, appellants must prove that respondents are failing to perform "a clear, present, and usually ministerial duty . . . [and that appellants have] a clear, present and beneficial right to performance of that duty." (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 58 [114 Cal.Rptr.2d 62]; see *Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 21 [21 Cal.Rptr.3d

66].) There being no facts in dispute, this court exercises its independent judgment in determining the matter. We agree with the trial court that appellants' causes of action for an injunction and for declaratory relief are redundant of their mandate petition; all appellants' claims present the same question of law: whether the termination of funding for the Assembly Bill 2034 program violates the MHSA.

 2. *The elimination of funding does not violate the continuing support requirement of section 5891.*

 Appellants contend that the termination of funding for Assembly Bill 2034 projects violates the MHSA requirement contained in section 5891, subdivision (a) that the state "shall continue to provide financial support for mental health programs with not less than the . . . amounts of allocations from the General Fund . . . provided in [fiscal year 2003–2004]."[7] Appellants contend that this requirement means that funding for each specific mental health program that was in effect when the MHSA was adopted must be maintained at the level that existed for that program as of fiscal year 2003–2004. The Department maintains that "[b]y its terms, the MHSA refers to 'mental health programs' in the plural aggregate form; it does not purport to single out the individual programs for protection." The trial court agreed with the Department, explaining: "The plain language of the statute is a clear reference to the aggregate of 'programs.' If the drafters of Proposition 63 had intended to perpetuate the funding of each (or every) program in existence in 2004, they would have inserted the word 'each' (or 'every') to modify the words 'mental health programs' in the segment of the statute . . . . There is not even a hint in the language of the act (or in any ballot related documents) that every mental health program existent in 2004 would be guaranteed funding in perpetuity if the voters approved Prop. 63."

 ■ We agree with the trial court's reading of the statute. Appellants dispute the significance of the statutory reference to mental health "programs" in the plural, arguing that the reference in the same sentence to "amounts of allocations" in the plural indicates that the funding requirement applies to the

---

 [7] The provision also requires maintaining the same level of entitlements and formula distributions of dedicated funds for mental health programs, but appellants do not argue on appeal that the elimination of funding for Assembly Bill 2034 projects violates either of these requirements. As appears in the lengthier quotation from section 5891, subdivision (a) that appears in the introduction to this opinion, the sentence in question is preceded by the sentence stating, "[T]hese funds shall not be used to supplant existing state or county funds utilized to provide mental health services." In the trial court appellants argued that this sentence imposes an additional requirement that has been disregarded. The trial court rejected any suggestion that this sentence imposes an additional requirement that has been disregarded, pointing to the Department's nonsupplantation policy and observing that appellants had presented no evidence that any county had failed to observe that policy. Appellants do not dispute this conclusion.

allocation to each mental health program. However, the budget contains numerous line items for mental health funding, which explains that pluralization. The reference to "amounts of allocations" is no indication that the section was intended to require continued baseline funding for every program funded under every line item in the budget directed to the Department, or to the treatment of mental health.

The 2003–2004 budget contains no specific mention of the AB 2034 program. Funds for that program, as for other programs, were included within a much larger budget item, item No. 4440-101-0001, "For local assistance, Department of Mental Health," and within a schedule included in that budget item for "Community Services—Other Treatment." That schedule also included appropriations for "Community Services—Children's Mental Health Services," "Community Services—AIDS," and "Community Services— Healthy Families." Appellants' interpretation of section 5891 would deprive the Department of its ability to contract any of these programs or to shift funds between programs as needs, circumstances and priorities change, at odds with other statutory provisions requiring the Department to constantly reevaluate the effectiveness of all programs for which it provides funding. (§§ 5814, subds. (a)(3)(A) & (b), 5847, subds. (b), (d), (f), (g)(1).) As the Department argues, under appellants' view of the statute, "it would appear that every program, including discretionary grants and contracts for mental health services, that existed in 2003–2004, would have to be fully funded in perpetuity, even if the program had never appeared as a budget line item, and even if the program became outdated in future years due to improved knowledge of mental health and/or the advent of more effective programs."

Appellants are correct that both the MHSA itself and the ballot argument in favor of the measure did refer specifically to the AB 2034 program and indicate that the measure was intended to expand such innovative programs. The findings and declarations with which the MHSA begins refer to the "recent innovative approach" begun in 1999 and "recognized in 2003 as a model program by the President's Commission on Mental Health," which "combines prevention services with a full range of integrated services to treat the whole person, with the goal of self-sufficiency for those who may have otherwise faced homelessness or dependence on the state for years to come." (Voter Information Guide, *supra*, text of Prop. 63, § 2, subd. (e), pp. 102–103.) The next section states that the purpose and intent of the measure includes "expand[ing] the kinds of successful, innovative service programs for children, adults and seniors begun in California." (*Id.*, § 3, subd. (c), p. 103.) The rebuttal ballot argument in favor of Proposition 63 stated that the program had been recognized as "a model for the nation," but that the program was then reaching fewer than 10 percent of those who could benefit from it, and that "Proposition 63 makes this new model program

available to the thousands now turned away." (Voter Information Guide, *supra*, rebuttal to argument against Prop. 63, p. 37, italics omitted.)

 Nonetheless, while it is fair to say that the MHSA was intended to increase the funding of mental health services such as those provided under Assembly Bill 2034, nowhere does the statute or any of the explanatory ballot materials suggest that the measure would remove from the Department its authority to monitor and adjust existing programs, which necessarily means reducing the financial support for some programs while increasing it for others. To the contrary, section 5890, subdivision (c) provides, "Nothing in this act shall be construed to modify or reduce the existing authority or responsibility of the State Department of Mental Health." The AB 2034 program was not an entitlement program that extended benefits to all qualified individuals or to all counties. Rather, section 5814 authorized the Department to make grants to counties submitting applications for projects that met certain statutory criteria. The program was to "be implemented only to the extent that funds are appropriated for the purposes of" the Adult and Older Adult Mental Health System of Care Act (§ 5800 et seq.). (§ 5814, subd. (a)(1).) Nothing in the MHSA purports to remove the qualification in section 5814 that the grants continue to be made only so long as the Legislature provides funding for such grants.

Moreover, the MHSA explicitly contemplates using funds from the Mental Health Services Fund to support services such as those that were provided under the Assembly Bill 2034 program. Section 5813.5, part of the MHSA, provides that subject to the availability of funds within the Mental Health Services Fund, the Department "shall distribute funds for the provision of services under Sections 5801, 5802 and 5806 to county mental health programs." Those three sections are within the preexisting Adult and Older Adult Mental Health System of Care Act and prescribe the basic approach and standards that were incorporated in the AB 2034 program. Section 5801, subdivision (a)(4), for example, provides that "[s]eriously mentally disordered adults and older adults should have an interagency network of services with multiple points of access and be assigned a single person or team to be responsible for all treatment, case management, and community support services." Section 5802, subdivision (a)(1) provides that "[a] comprehensive and coordinated system of care includes community-based treatment, outreach services and other early intervention strategies, case management, and interagency system components required by adults and older adults with severe and persistent mental illness." Section 5802, subdivision (d)(4) declares that it is the intent of the Legislature to "[p]rovide funds for counties to establish outreach programs and to provide mental health services and related medications, substance abuse services, supportive housing or other housing assistance, vocational rehabilitation and other nonmedical programs necessary to stabilize homeless mentally ill persons or mentally ill persons at risk of

being homeless, get them off the street, and into treatment and recovery . . . ." (See also, e.g., § 5806, subds. (a)(2), (10), (c)(1).) Section 5847, another provision of the MHSA, requires each county mental health program to prepare a three-year plan to be updated annually which shall include, among other things, "[a] program for services to adults and seniors in accordance with [section 5800 et seq.]" (§ 5847, subd. (b)(3).)[8]

Section 5890, also part of the MHSA, provides that funds are continuously appropriated from the Mental Health Services Fund "for the purpose of funding the following programs and other related activities as designated by other provisions of this division: [¶] [Section 5800 et seq.], the Adult and Older Adult System of Care Act." (§ 5890, subd. (a)(1).) Section 5892 provides further specificity with respect to the expenditure of funds from the Mental Health Services Fund, but explicitly includes the distribution of funds for each county mental health program under section 5800 et seq. (§ 5892, subds. (a)(5) & (6), (b).) Thus, the portion of section 5891 stating, "These funds shall only be used to pay for the programs authorized in Section 5892. These funds may not be used to pay for any other program," must be understood to anticipate the expenditure of funds generated by the MHSA to support county mental health service programs for homeless or potentially homeless persons comparable to those programs that had been supported with grants under the AB 2034 program.

██ Thus, while section 5891 precludes the reduction of financial support for mental health programs from the state's General Fund below the aggregate level of funding in 2003–2004, the reduction or elimination of funding from the General Fund for particular programs is consistent with the overall statutory scheme within which the Department operates and is not inconsistent with the mandate of the MHSA if that aggregate funding level is maintained. This conclusion is further confirmed by yet another provision within the MHSA. Section 5895 provides, "In the event any provisions of [section 5800 et seq., in which the provisions authorizing the AB 2034 program appear], are repealed or modified so the purposes of this act cannot be accomplished, the funds in the Mental Health Services Fund shall be

---

[8] Section 5840, also within the MHSA, requires the Department to establish a program designed to prevent mental illnesses from becoming severe and disabling which shall include, among other things, "[a]ccess and linkage to medically necessary care provided by county mental health programs . . . for adults and seniors with severe mental illness . . . as early in the onset of these conditions as practicable." (§ 5840, subd. (b)(2).)

"The program shall include mental health services similar to those provided under other programs effective in preventing mental illnesses from becoming severe, and shall also include components similar to programs that have been successful in reducing the duration of untreated severe mental illnesses and assisting people in quickly regaining productive lives. [¶] . . . The program shall emphasize strategies to reduce the following negative outcomes that may result from untreated mental illness: [¶] . . . [¶] . . . Homelessness." (§ 5840, subds. (c), (d)(6).)

administered in accordance with those sections as they read on January 1, 2004." This section expressly contemplates the possibility that the provisions under which the AB 2034 program was authorized will be modified or even repealed. Such a possibility is not inconsistent with the requirement that the aggregate level of mental health care funding from the General Fund be maintained at least at the 2003–2004 level, but it is inconsistent with an interpretation of the act that would require perpetual baseline funding for every mental health program that was in existence at that time.

As the trial court observed, and as confirmed by the figures cited above, appellants "do not contest that the elimination of the AB 2034 Program did not reduce the amount of funding the state provides from the general fund for mental health programs to an amount less than provided in FY 2003/2004." The Department emphasizes that "the state spent approximately $240 million more in general fund expenditures in the fiscal year this action was filed (2007–2008) for five appropriation items for county mental health services than it spent on the four items that existed in 2003–2004." While not disputing these figures, appellants point out that "this was due entirely to the state's increase in funding for EPSDT, the Medi-Cal program for children funded jointly by the federal government, the state, and the counties. Because EPSDT is an entitlement, expenditures must be increased to whatever amount is needed to provide federally mandated EPSDT services to all eligible individuals. As a result, the state's portion of EPSDT expenditures, which are paid in part by the general fund, has grown substantially every year since the pre-MHSA baseline year against which compliance with the [MHSA] is measured."

■ Because EPSDT services apply only to children, appellants argue that if section 5891 is construed to require maintenance of only the aggregate level of mental health care funding from the General Fund, "the state could eliminate every *adult* mental health program or service in place during fiscal year 2003–04 and still comply with the [MHSA], because the state's general fund spending on EPSDT . . . has increased by more than the funding for all the adult programs that respondents have eliminated or could choose to eliminate." While appellants argue that "[t]his cannot be right," what is not right is the conclusion appellants draw from this highly unlikely hypothetical scenario. Additional federal funding may well become available to support some of the state's mental health programs, but such additional funding, which reduces the burden on the state's General Fund, does not modify the requirements imposed by section 5891. Even if federally mandated mental health services to children affect the mix of services provided from the General Fund, those services nonetheless require expenditures from the General Fund. We cannot construe section 5891 to require continued baseline funding in perpetuity for every pre-MHSA mental health program to avoid appellants' hypothetical dilemma. The intent underlying the MHSA was to

provide additional funding for mental health services over and above an undiminished level of mental health services paid for out of the state's General Fund. That purpose is accomplished even if the mix of mental health services financed from the General Fund changes over time.

Finally, the trial court also justified its conclusion with the observation that appellants' interpretation of the statute "would violate the proscription against divesting the Legislature of its proper role," citing California Constitution, article IV, section 12 and *People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316 [226 Cal.Rptr. 640]. Appellants question the holding in *People's Advocate* and argue that because the MHSA is an initiative statute, rather than a statute adopted by the Legislature, their interpretation would not violate the state Constitution. (See Cal. Const., art. II, §§ 8, 10; *Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, 440–441 [100 Cal.Rptr.3d 408]; *Watson v. Fair Political Practices Com.* (1990) 217 Cal.App.3d 1059, 1072–1073 [266 Cal.Rptr. 408]; *Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 615 [96 Cal.Rptr.3d 379].) Appellants also assert that the constitutional issue applies to either interpretation of the statute, but since the state has continued to provide aggregate mental health funding at the 2003–2004 level, the issue does not arise under the construction of the statute urged by the Department and adopted by the trial court. We need not and do not resolve the constitutional question, but note that our reading of the statute has the salutary effect of avoiding the constitutional issue. (See, e.g., *Clare v. State Bd. of Accountancy* (1992) 10 Cal.App.4th 294, 303 [12 Cal.Rptr.2d 481].)

### 3. *The elimination of funding does not violate the structure requirement of section 5891.*

 Appellants contend that the elimination of funding for the AB 2034 program also violates the mandate in section 5891, subdivision (a) that the state "not make any change to the structure of financing mental health services, which increases a county's share of costs or financial risk for mental health services unless the state includes adequate funding to fully compensate for such increased costs or financial risk." They argue that the elimination of the program "violated this requirement because it changed 'the structure of financing mental health services'; because the change increased the counties' 'share of costs or financial risk for mental health services'; and because the state did not 'fully compensate' the counties 'for such increased costs or financial risk.'" The Department correctly contends that regardless of any indirect shifting of the costs or financial risk of mental health services that may have resulted from the termination of the AB 2034 program, this provision of the statute is not violated unless the shift results from a change in the structure by which those services are financed. The Department further

argues that "[e]liminating funding for a discretionary grant program that was always conditioned on there being sufficient funds appropriated—and that never operated statewide—is not a 'change to the structure of financing mental health services.' " The trial court concluded that this provision was not violated by the elimination of the AB 2034 program because the state did not "thereby require[] counties to continue the mental health program with county dollars."

In support of their contention that the elimination of the AB 2034 program changed the structure of mental health care financing, appellants argue, "Before the program was eliminated, thousands of homeless mentally ill Californians were receiving services which, though provided by the counties or their contractors, were nevertheless state funded. The elimination of the Program, by definition, eliminated this funding and thereby changed 'the structure of financing mental health services.' " We do not believe the issue can be resolved so simply. Despite any indirect financial consequences that may result from terminating a particular program, the reduction or elimination of funding for a single program cannot fairly be regarded as a "structural" change. Much closer to the mark is the Department's understanding that a structural change is one "that directly cause[s] a change of responsibility and an increase in financial risk to the counties, such as realignment, county-managed care plans, and increases in the percentage of costs of specific services that counties [are] required to pay." The Department contrasts the elimination of funding here with three illustrations of what, as appellants recognize, unquestionably were structural changes: the 1991 transfer of financial responsibility for mental health programs from the state to the counties, referred to as "realignment"; the mid-1990's decision to provide most Medi-Cal mental health services through managed care plans at the county level rather than through the previous fee-for-service system in which providers billed the state; and the 2003 shift to the counties of 10 percent of the cost of the nonfederal match for EPSDT growth over the baseline amount.

Appellants argue that as a result of eliminating the Assembly Bill 2034 grants, those counties that received such grants have been compelled to pay the local share of Medi-Cal-funded mental health care services that are not federally reimbursed and were formerly paid with Assembly Bill 2034 grant money; that the elimination of the Assembly Bill 2034 grants increases the hospitalization and incarceration rate for those who formerly received services funded by those grants, increasing county-mandated costs for mental health services for those individuals; and that the elimination of the grant program also increases the counties' cost of providing mental health services that are not mandated by statute or regulation. While acknowledging that these are at most indirect consequences of eliminating the AB 2034 program, appellants argue that the prohibition of structural changes in section 5891, subdivision (a) is not limited to changes that "directly" impact the counties.

That may be, but the change still must be "structural." The fact remains that the elimination of the AB 2034 program did not place upon the counties any legal obligation to pay for mental health services that did not already exist. Assuming, as appellants contend, that the cost of satisfying those obligations rose for some counties as a result of terminating the Assembly Bill 2034 grants, the increase in costs does not equate with a change in the structure of the system. As confirmed by the very dictionary definition to which appellants refer, "structure" refers to an object's "pattern of organization," not its cost, or to "the aggregate of elements of an entity in their relationships to each other." (Webster's New Collegiate Dict. (1979) p. 1146.)

■ As the Department argues, if indirect financial consequences alone were considered a structural change, "it is difficult to imagine any reconfiguration of services that could not be argued to have a fiscal impact" and thus potentially be in violation of the statute. Moreover, appellants' reading of the structural change prohibition would render the continuing support requirement superfluous, since any reduction in funding almost certainly will have some fiscal impact and therefore would constitute a structural change that is prohibited without offsetting increases in state support. While one can imagine unlikely hypothetical situations involving a violation of one requirement but not the other, the realistic consequence of appellants' interpretation would be to make the reduction of funding for any mental health program a restructuring, rendering inconsequential whether aggregate state mental health expenditures were maintained at their 2003–2004 level. On the other hand, reading the provision as interpreted by the Department and the trial court gives meaning to both strictures in section 5891, subdivision (a). The state must maintain an aggregate baseline of funding for county mental health services, and also must not make structural changes to the mental health financing system that result in increased unreimbursed county costs even if such changes do not reduce state expenditures below the baseline.

### 4. Other issues.

In view of the conclusions we have reached above, it is unnecessary to consider the additional arguments advanced by the Department in support of the judgment in favor of the Governor and the denial of declaratory and injunctive relief. We also reject appellants' contention that the trial court erroneously excluded evidence tending to show accomplishments of the AB 2034 program and the increase of indirect costs to the counties as a result of the program's elimination. None of the proffered evidence would alter any of the conclusions expressed herein.

## Disposition

The judgment is affirmed.

Siggins, J., and Jenkins, J., concurred.

A petition for a rehearing was denied January 10, 2011, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied, March 2, 2011, S189842.