Filed 3/1/22  Bernard v. Cal. Health Facilities etc. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| M.A. BERNARD et al., | C088586 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. 34201600203224CUMCGDS, 34201700219002) |
| v. | |
| CALIFORNIA HEALTH FACILITIES FINANCING AUTHORITY et al., | |
| Defendants and Respondents. | |

Appellant M.A. Bernard filed an action in the trial court challenging the No Place Like Home Act (the NPLH Act) as adopted by Assembly Bill Nos. 1618 (AB 1618) and 1628 (AB 1628) (2015-2016 Reg. Sess.) in 2016.

Appellant pleaded five causes of action. Two of the five causes were based, in part, on the fact that the NPLH Act had not been ratified by California voters.

Later, Respondents the California Health Facilities Financing Authority (the Authority) and the Department of Housing and Community Development (the Department) filed a validation action to obtain judicial approval of various actions they proposed to take under the NPLH Act. The trial court consolidated the actions and entered a final judgment in Respondents' favor on all causes of action. Before Appellant

1

filed her notice of appeal, the California voters passed Proposition 2 (Gen. Elec., Nov. 6, 2018) which ratified the NPLH Act. As a result, some issues Appellant raised in her action are now moot. As to the remaining issues raised in both Appellant's action and the Respondents' validation action, we agree with the trial court and affirm the judgment.

THE RECORD ON APPEAL

Appellant's Appendix does not comply with California Rules of Court, rules 8.124(b)(1) & (d) and 8.144(b)(2). For example, the appendix is not in chronological order, the numbering does not begin with the cover as page one, Respondents' entire trial brief--along with its attachments--appears to be missing, and the objections to evidence raised by the Respondents and ruled on by the trial court are missing.

Additionally, Respondents did not file a respondents' appendix or make any objection to the form of the appendix appellants filed. While we were able to prepare this opinion using the record provided, our review would have been expedited had the record been in the proper form and contained a more complete description of what took place in the trial court.

On April 4, 2019, this court denied Appellant's request for judicial notice of an informal opinion letter prepared by the California Attorney General in February 2006. As such, we disregard arguments and factual statements made by Appellant that depend on us taking notice of that document.

FACTS AND HISTORY OF THE PROCEEDINGS

A.    Adoption of the Mental Health Services Act and the No Place Like Home Program

"In November 2004, the voters passed Proposition 63, enacting the [Mental Health Services Act (MHSA)], adding numerous provisions to the Welfare and Institutions Code and the Revenue and Taxation Code. As summarized by the Legislative Analyst in the official voter information guide, the proposition 'establishes a state personal income tax

2

surcharge of 1 percent on taxpayers with annual taxable incomes of more than $1 million. Funds resulting from the surcharge would be used to expand county mental health programs. [¶] . . . [¶] . . . The proposition specifies that the revenues generated from the tax surcharge must be used to expand mental health services and could not be used for other purposes . . . .' [(Voter Information Guide, Gen. Elec. (Nov. 2, 2004) analysis of Prop. 63 by Legis. Analyst, p. 34.)]" (*Mental Health Assn. in California v. Schwarzenegger* (2010) 190 Cal.App.4th 952, 957, fn. omitted.)

The measure created the Mental Health Services Fund (the MHS Fund), "into which funds generated by the new tax surcharge were to be deposited and 'all moneys in the fund are continuously appropriated . . . for the purpose of funding' programs authorized by the act. ([Welf. & Inst. Code, § 5890, subd. (a).)" (*Mental Health Assn. in California v. Schwarzenegger, supra,* 190 Cal.App.4th at p. 957; see also Rev. & Tax Code, § 19602.5.)

In 2016, the Legislature enacted and the Governor approved AB 1618 and AB 1628. (See Stats. 2016, chs. 43 & 322.) Both bills passed with more than two-thirds of each house voting in favor of the bill. (See Final History of Assem. Bill No. 1618 (2015-2016 Reg. Sess.); Final History of Assem. Bill No. 1628 (2015-2016 Reg. Sess.).) The NPLH Act established the No Place Like Home Program (the NPLH Program) (see Stats. 2016, ch. 43, § 5 [adding part 3.9, §5849.1 et seq. to the Welfare and Institutions Code]) and its financing structure (see, e.g., Stats. 2016, ch. 322, § 1 [adding § 15643 to the Government Code]). The Legislature made amendments to the NPLH Act in 2017. (See, e.g., Stats. 2017, ch. 561, §§ 271-275.) These amendments also passed with more than two-thirds of each house voting in favor of the bill containing the amendments. (See Final History of Assem. Bill No. 1516 (2017-2018 Reg. Sess.).)

In November 2018, California voters ratified and made additional amendments to the NPLH Act. (See Welf. & Inst. Code, § 5849.15, see also Text of Proposed Laws

(Nov. 6, 2018) text of Prop. 2 at pp. 9-13; Official Voter Information Guide (Nov. 6, 2018) analysis of Prop. 2 by Legis. Analyst, p. 19.)

###### B.     The <u>NPLH</u> <u>Program</u>

The NPLH Act declares that, "(1) [h]ousing is a key factor for stabilization and recovery to occur and results in improved outcomes for individuals living with a mental illness[;] [¶] (2) [u]ntreated mental illness can increase the risk of homelessness[;] . . . [¶] . . . [¶] (8) [f]or every dollar of bond funds invested in permanent supportive housing, the state and local governments can leverage a significant amount of additional dollars through tax credits, Medicaid health services funding, and other housing development funds[;] [¶] . . . [¶] (10) [t]he cost in public services for a chronically homeless Californian ranges from $60,000 to $100,000 annually[, and w]hen housed, these costs are cut in half and some reports show reductions in cost of more than 70 percent, including potentially less involvement with the health and criminal justice systems[;] [¶] . . . [¶] (11) Californians have identified homelessness as their top tier priority; this measure seeks to address the needs of the most vulnerable people within this population[; and] [¶] . . . [¶] (12) [h]aving counties provide mental health programming and services is a benefit to the state."

Under the NPLH Act, the Authority would enter into service contracts with the Department, under which the Department would provide services to support the development of permanent supportive housing for individuals who are homeless, chronically homeless, or at risk of chronic homelessness. (Welf. & Inst. Code, § 5849.35, subds. (a)(2), (b)(1); see also Welf. & Inst. Code, §§ 5849.2, subd. (m), 5849.7-5849.9.)

Pursuant to contracts between the Department and the Authority, the Department can (1) allocate up to $1.8 billion in funds to be distributed to counties on a competitive basis to finance capital costs of supplying permanent supportive housing to persons who

4

are homeless, chronically homeless, or at risk of becoming chronically homeless (Welf. & Inst. Code, §§ 5849.7, subds. (a) & (b), 5849.8); and (2) distribute up to $200 million in funds on an " 'over-the-counter' basis to finance the construction, rehabilitation, or preservation, and to capitalize operating reserves, of permanent supportive housing for individuals in the target population with a priority for those with mental health supportive needs who are homeless or at risk of chronic homelessness" (Welf. & Inst. Code, § 5849.9). The NPLH Act describes various minimum criteria to be considered in making both competitive and "over-the-counter" awards of funds. (Welf. & Inst. Code, §§ 5849.7, subd. (c), 5849.8, subd. (a)(1), 5849.9, subd. (a).)

Welfare and Institutions Code section 5849.5, allows the Department to "adopt guidelines or regulations, including emergency regulations to expedite the award of moneys pursuant to" the NPLH Act, "in consultation with the California State Association of Counties and other stakeholders, as necessary to exercise the powers and perform the duties conferred or imposed on it by this part. Any guideline or regulation adopted pursuant to this section shall not be subject to the requirements of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code)."

C.    NPLH Program Financing

The NPLH Act allows the Authority to issue up to $2 billion in revenue bonds for the purpose of financing the NPLH Program. (See Gov. Code, § 15463, subds. (b) & (d).) The NPLH Act created within the State Treasury the No Place Like Home Fund (NPLH Fund), into which will be deposited, "moneys from the receipt of loan proceeds by the department derived from the issuance of bonds by the authority under" the NPLH Act; any appropriation or transfer of funds for the NPLH Program from the General Fund or other funds; funds from any "other federal or state grant . . . [or] private donation or grant" for program expenses; and any "interest payment, loan repayments, or other return

5

of funds." (Welf. & Inst. Code, § 5849.4, subds. (a)-(b).) Money in the NPLH Fund is to be appropriated for use by the Department, Authority, and State Treasurer to carry out the NPLH Program. (Welf. & Inst. Code, § 5849.4, subd. (a).)

The NPLH Act also created, within the MHS Fund, the Supportive Housing Program Subaccount (the Housing Subaccount). (Welf. & Inst. Code, § 5890, subd. (f)(1).) Monies in the Housing Subaccount are to be used by the Authority to satisfy its financial obligations under service contracts entered into with the Department. (Welf. & Inst. Code, § 5890, subd. (f)(1).) Each month, before expending funds for any other purpose, the Controller will transfer from the MHSA Fund to the Housing Subaccount an amount the Authority has certified it will need to pay to the Department pursuant to service contracts between the Authority and the Department. (Welf. & Inst. Code, §§ 5849.35, subd. (a)(3), 5890, subd. (f).) The amount transferred cannot exceed an aggregate of $140 million per year. (Welf. & Inst. Code, § 5890, subd. (f).) If monies transferred from the MHSA Fund into the Housing Subaccount are deposited into the NPLH Fund before the Authority issues bonds under the NPLH Act, the amount of bonds the Authority will be authorized to issue "shall" be reduced "by a corresponding amount." (Welf. & Inst. Code, § 5890, subd. (f)(2).)

Government Code section 15463, subdivision (d), allows the Authority to "make secured or unsecured loans to the Department . . . in connection with financing permanent supportive housing pursuant to the No Place Like Home Program or to refund bonds previously issued pursuant to this section, in accordance with an agreement between the [A]uthority and the Department . . . ." "Payments received by the [D]epartment under any service contract" with the Authority, which would include payments made from Housing Subaccount of the MHSA Fund, "shall be used, before any other allocation or distribution, to repay loans from the authority pursuant to Section 15463 of the Government Code." (Welf. & Inst. Code, § 5849.35, subd. (b)(2).) The NPLH Act allows the Department to "pledge and assign its right to receive all or a portion of the

6

payments under the service contracts entered . . . directly to the [A]uthority or its bond trustee for the payment of principal, premiums, if any, and interest under any loan agreement authorized" with the Authority by the NPLH Act. (Welf. & Inst. Code, § 5849.35, subd. (b)(3).)

As a result of this financing rubric, funds collected under the MHSA will ultimately be used to finance the NPLH Program.

### D. NPLH Program Oversight

The NPLH Act contains mechanisms of oversight and review of the Department's actions in carrying out the NPLH Program. The NPLH Act established a No Place Like Home Advisory Committee (NPLH Committee), to be comprised of various government and community representatives, including the Treasurer or his or her designee, a resident of supportive housing, and a representative of a community mental health organization. (Welf. & Inst. Code, § 5849.3, subd. (a).) The NPLH Committee must, "(1) [a]ssist and advise the department in the implementation of the program[;] [¶] (2) [r]eview and make recommendations on the department's guidelines[; and] [¶] (3) [r]eview the department's progress in distributing moneys" according to the NPLH Act. (Welf. & Inst. Code, § 5849.3, subd. (b).) The NPLH Act requires counties to make annual reports to the Department regarding activities funded under the NPLH Act, and the Department to make an annual report to the Legislature regarding the processes established to distribute funds, the distribution of funds among counties, and recommendations for program modifications. (Welf. & Inst. Code, § 5849.11.)

An action to determine the validity of a bond issued or contract made pursuant to the NPLH Act "may be brought in accordance with Section 17700 of the Government Code." (Welf. & Inst. Code, § 5849.13.)

7

E.    Procedural History

Appellant filed the first action--a Complaint for Reverse Validation and for Declaratory and Injunctive Relief--in November 2016.  Appellant amended her complaint three times, such that the operative complaint is the Third Amended Complaint.  We will describe Appellant's theories in the Third Amended Complaint as we address her arguments.  The court sustained demurrers to one cause of action Appellant alleged in her Second and Third Amended Complaints in which she argued statutes governing validation proceedings violate constitutional guarantees of due process, equal protection and the separation of powers.

Respondents filed their validation action in September 2017, in which they sought to validate various bonds; a service contract and loan under Welfare and Institutions Code section 5849.35; other contracts and related matters; and a resolution that authorized the issuance of the bonds, and the execution and delivery of the loan agreement and contracts.  The Respondents published a summons and notice of the action in *The Sacramento Bee*, *The San Francisco Chronical*, *The Los Angeles Times*, *The Fresno Bee*, and *The San Diego Union-Tribune*.  Appellant filed an opposition to the summons.

The parties agreed and stipulated to resolve the consolidated action though briefing and oral argument.  On September 26, 2018, the trial court ruled in Respondents' favor on the four remaining causes of action alleged in Appellant's operative complaint.  The trial court also found that the published summons in the Respondents' validation action was sufficient.  The court also granted Respondents' request for judgment "validating the NPLH Act," as adopted by AB 1618 and AB 1628, "and its corresponding revenue bonds, contracts and related obligations."

Appellant then brought an unsuccessful motion to vacate the judgment.  Thereafter, Appellant filed a timely notice of appeal.

8

DISCUSSION

I

*Standard of Review*

This case involves questions of statutory construction and the constitutionality of statutory enactments. As such, we review the issues de novo. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232 ["We review de novo questions of statutory construction"]; *Townsel v. San Diego Metro. Transit Dev. Bd.* (1998) 65 Cal.App.4th 940, 946 ["This appeal presents a question of constitutional law which we review de novo, independent of the trial court's ruling"].)

With respect to challenges made to the constitutionality of statutes, California courts recognize two types of constitutional challenges to statutes: "facial" and "as applied." "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "An as applied challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute or ordinance in the allegedly impermissible manner it is shown to have been applied in the past. It contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Ibid.*)

With respect to facial challenges to statues, California courts have long recognized a "strong presumption of the constitutionality of an act of the legislature." (*Delaney v. Lowery* (1944) 25 Cal.2d 561, 569; see also *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1504 ["These principles govern a challenge to the facial validity of

9

a statute"].)  " 'Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act.'  [Citations.]"  (*Amwest Sur. Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1252 [ ].)

"When confronted with a facial challenge to the constitutional validity of a statute, the California Supreme Court has sometimes articulated differing standards.  (*Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145 [ ], citing *Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126 [ ].)  'Under the strictest test, the statute must be upheld unless the party establishes the statute " 'inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' " [Citation.] Under the more lenient standard, a party must establish the statute conflicts with constitutional principles " 'in the generality or great majority of cases.' " [Citation.] Under either test, the plaintiff has a heavy burden to show the statute is unconstitutional in all or most cases, and " 'cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute.' " ' [Citations.]  If a statute is constitutional in its general and ordinary application, the statute is not facially unconstitutional merely because 'there might be some instances in which application of the law might improperly impinge upon constitutional rights.'  (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 347 [ ]; see *Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1132; *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 311 [ ].)"  (*City of San Diego v. Boggess, supra*, 216 Cal.App.4th at pp. 1503-1504.)

## II

*Appellant's Complaint Lacks Merit*

Below, Appellant alleged five theories as to why the NPLH Act was constitutionally infirm under either the U.S. or California Constitution, or both.  Two of

10

those theories were rendered moot by the passage of Proposition 2, and Appellant's efforts to revive them are not convincing. The remaining three theories also fail.

A. Arguments that the NPLH Act Unconstitutionally Amended the MHSA and Exceeded the Debt Limit Were Mooted by Proposition 2

Proposition 2 mooted arguments Appellant made below that the NPLH Act (1) amended the MHSA, a statutory scheme adopted by ballot proposition, in violation of article II, section 10, subdivision (c), of the California Constitution; and (2) violated debt limitations contained in article XVI, section 1, of the California Constitution. Appellant's efforts to revive these challenges by making arguments about the possible use of funds appropriated for the NPLH Program in the Budget Act of 2017 are not persuasive.

In June 2017, after Appellant filed her action, but before the trial court entered its final judgment below, the Legislature passed and the Governor approved the Budget Act of 2017. (See Final History of Assem. Bill No. 97 (2017-2018 Reg. Sess.).) The Budget Act of 2017 contained line items that would have appropriated monies from the NPLH Fund to the Department, contingent in part on the validation and issuance of bonds. (Stats. 2017, ch. 14, § 2.) Under the act, (1) $5,124,000 would be allocated from the NPLH Fund to support Department activities, with $4,479,000 being allocated to the Financial Assistance Program and $645,000 going to the Housing Policy Development program (Stats. 2017, ch. 14, § 2); and (2) an additional $262,000,000 would be allocated from the NPLH Fund to the Financial Assistance Program to enable the Department to provide local assistance (Stats. 2017, ch. 14, § 2).

The objectives of the Financial Assistance Program "are to: (1) increase housing supply by providing loans and grants to develop and preserve safe and affordable housing for lower-income households, (2) promote economic, community, and job development by awarding state and federal housing funds, (3) reduce homelessness through financial

11

assistance and policy leadership, and (4) monitor funding recipients for compliance with the terms of their contracts with the state.  The program also promotes economic and job development through administration of the federal Community Development Block Grant Program, and is responsible for the state Enterprise Zone Program wind-down." (Governor's Budget 2017-2018 (Jan. 10, 2017), 2240 Department of Housing and Community Development Program Descriptions, at p. BCH 3; see also Gov. Code, § 13338, subd. (a) ["The Budget Bill shall utilize a coding scheme compatible with the Governor's Budget and with the records of the Controller"].)

The objectives of the Housing Policy Development Program "are to: (1) facilitate an adequate supply of housing affordable to all income groups through the development, promotion, and implementation of housing and community development policies, practices, and partnerships, (2) provide oversight for local housing plans, (3) administer planning and incentive grant programs, and (4) collect and analyze data to evaluate and communicate progress in meeting HCD goals and outcomes."  (Governor's Budget 2017-2018 (Jan. 10, 2017), 2240 Department of Housing and Community Development Program Descriptions, at p. BCH 3; see also Gov. Code, § 13338, subd. (a).)

In her first cause of action, Appellant alleged the NPLH Act as adopted through AB 1618 and AB 1628 was facially invalid, because it was "inconsistent with, and violate[d] the intent of Prop. 63/MHSA."  More specifically, Appellant alleged the NPLH Act violated article II, section 10, subdivision (c), of the California Constitution, which states that "[t]he Legislature may amend or repeal . . . an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without [the electors'] approval."  Though the MHSA had contained language allowing the Legislature to amend it without sending it to the voters in limited circumstances, Proposition 63 specified those changes must be "consistent with and further the intent of this act."  (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) text of Prop. 63, § 18, p. 108.)

12

In her fourth cause of action, Appellant alleged that, as adopted through AB 1618 and AB 1628, the NPLH Act violated article XVI, section 1 of the California Constitution, which places a "debt limitation" of $300,000 on the amount of debt the Legislature can create, except in certain circumstances. The Legislature can protect itself from running afoul of the debt ceiling limitations by enacting a law that authorizes debt for "some single object or work to be distinctly specified therein" and meets various financial structuring requirements not an issue here. (See Cal. Const., art. XVI, § 1 ["The Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars ($300,000), . . ., unless the same shall be authorized by law for some single object or work to be distinctly specified therein"].) Additionally, "no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election; and all moneys raised by authority of such law shall be applied only to the specific object therein stated or to the payment of the debt thereby created." The trial court found the NPLH Act did not violate the constitutional debt ceiling under both a special fund exception and a contingent fund exception to the debt limit.

" 'A case is considered moot when "the question addressed was at one time a live issue in the case," but has been deprived of life "because of events occurring after the judicial process was initiated." (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 120 [ ].) Because " 'the duty of . . . every . . . judicial tribunal . . . is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it[,] [i]t necessarily follows that when . . . an event occurs which renders it impossible for [the] court, if it should decide the case in favor of

13

plaintiff, to grant him [or her] any effectual relief whatever, the court will not proceed to formal judgment . . . .' [Citations.]" (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [ ].) The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227 [ ]; see also *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557 [ ] [case moot where contract with county had expired and court could not award it to disappointed bidder].) . . .' (*Wilson & Wilson* [*v. City Council of Redwood City* (2011)] 191 Cal.App.4th [1559,] 1574.)" (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 216-217 [ ].)

Thus, Appellant's first cause of action, which challenges the NPLH Act because it allegedly is inconsistent with the MHSA is moot. Article II, section 10, subdivision (c) of the California Constitution, which serves as the legal basis for Appellant's claim, allows the Legislature to amend voter initiatives, "when approved by the electors." By passing Proposition 2, the electors approved the amendments to the MHSA contained in the NPLH Act.

Similarly, to the extent the fourth cause of action is based on the allegation that with the NPLH Act the Legislature authorized debt that both exceeded $300,000 and was not approved by the voters, the issue was mooted by Proposition 2's passage. The electors approved the NPLH financing scheme after it was "passed by a two-thirds vote of all the members elected to each house of the Legislature." (See Cal. Const, art. XVI, § 1.)

Citing provisions of the 2017 Budget Act, Appellant now attempts to convert her argument with respect to her first and fourth cause of action to one that challenges the allocation of funds as stated in the budget act. Appellant's logic appears to be as follows: Both the MHSA and the NPLH Act, as ratified by the voters, prohibit the transfer of funds collected under them for other uses. Absent exceptions not at issue here, MHSA funds are to be used to expand mental health services. NPLH Act funds are to be used to

14

help supply permanent supportive housing to persons with severe mental illnesses. The types of activities identified as falling within the objectives of the Financial Assistance Program and Housing Policy Development Program, which are to receive NPLH Funds under the Budget Act of 2017, are not exclusively dedicated to providing services and/or housing to severely mentally ill persons. Therefore, when the Department uses the funds as allocated by the Budget Act of 2017, they will violate the California Constitution's prohibitions on (1) amending an initiative statute without voter approval, as contained in article II, section 10, subdivision (c); and (2) using monies acquired via a voter approved debt for something other than the single subject purpose identified, as contained in article XVI, section 1.

Appellant's effort to avoid the mootness of her claims resulting from the passage of Proposition 2 appears to be a facial challenge to the 2017 Budget Act based on vague, unsupported assertions about how the allocated funds will inevitably be used once appropriated. " 'A plaintiff challenging the facial validity of a statute "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 [ ].)' (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 38–39 [ ].)" (*People v. McCray* (2006) 144 Cal.App.4th 258, 265.) As the Respondents aptly observe, that the Department's "Financial Assistance Program oversees administration of the Community Development Block Grant Program and wind-down of the Enterprise Zone Program does not suggest that NPHL funds could or would be used to fulfill these tasks." The program descriptions leave room for funds to be used as contemplated by the NPLH Act.

Likewise, if Appellant's new argument is that the Department's and Authority's use of the funds as allocated by the Budget Act of 2017 will violate the California Constitution, it is currently based on speculation of hypothetical uses to which the

Department may put the funds, and we will not consider it. (See *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 64 (*Santa Monica*).)

B.      The NPLH Act Does Not Impermissibly Delegate Legislative Decisions to Administrative Agencies

In her second cause of action Appellant alleged--and she continues to argue on appeal--the NPLH Act delegated an excessive amount of Legislative powers to the Authority and the Department in violation of the constitutional principle of separation of powers.

"An unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy." (*Carson Mobilehome Park Owners' Ass'n v. City of Carson* (1983) 35 Cal.3d 184, 190.) " 'The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the "power to fill up the details" by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . . .' (*First Industrial Loan Co. v. Daugherty* (1945) 26 Cal.2d 545, 549 [ ].)" (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 376.)

The trial court correctly found the NPLH Act, as enacted by the Legislature, satisfied these requirements, and the reasoning is equally apt to the NPLH Act as ratified by the electorate with Proposition 2. Thus, "Here, the Legislature" and the electorate, "made the fundamental policy decisions relative to how the financing [of] permanent supportive housing pursuant to the NPLH Program would be accomplished through the enactment of [Government Code] section 15463, sub[divisions] (b) through (d). Further, the Legislature specified the fundamental policy decision as to why such financing for permanent supportive housing was necessary through its enactment of Welfare and Institutions Code section 5849.1. Furthermore, the Legislature provided more than

16

adequate direction on the implementation of the NPLH Program. . . . [T]he NPLH Act specifically sets forth, among other factors, the maximum value of the bonds that can be issue[d], how the bonds are to be repaid, and the nature of the contracts that may be executed to effectuate the financing plan. (See Gov. Code, § 15643, subd. (b); Welf. & Inst. Code, §§[ ]5849.35(a)(2), (b)(1[)-(]3).) The Legislature specified implementation measures by enacting statutes that directly guide which entities may apply for funding, what the eligibility requirements are for applicants, and the criteria to be used in evaluating the applicants. (See Welf. & Inst. Code, §§ 5849.7, [subd. ](c)(1), 5849.8,[ subds. ](a)(1) [&] (2) . . .) This court finds these statutes not only provide sufficiently clear standards, but also provide the requisite procedural safeguards to ensure the NPLH Program is effectuated as intended."

Appellant makes two unpersuasive arguments as to why the trial court's conclusion was incorrect. First, Appellant suggests that by exempting the Department from the APA when it develops regulations to implement the NPLH Program, the NPLH Act per se failed to provide sufficient standards and direction for implementing the NPLH Program. Second, Appellant argues that the Legislature wrongfully gave up its "power of the purse" by enacting a law that directs the Department to establish a competition to disperse funds to local entities.

As to Appellant's first argument, the California Administrative Procedure Act (Gov. Code, § 11340 et seq., see also Gov. Code, § 11370, APA) contains statutes that "establish basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations." (Gov. Code, § 11346.) These statutes were first added to the APA by legislative enactment in 1947. (Gov. Code, § 11346 [indicating current statute was derived from former Gov. Code, § 11420, as added by Stats. 1947, ch. 1425, § 11]; see also Clarkson, *The History of the California Administrative Procedure Act* (1964) 15 Hastings L.J. 237, 247 [describing the 1945 legislation that governed administrative agencies' quasi-judicial function], 249 [noting that, with the

17

passage of 1947 Legislation, California now had a statutory program that governed administrative agencies delegated or implied judicial and legislative functions].) The APA states that its requirements can be superseded or modified by "subsequent legislation . . . to the extent that the legislation shall do so expressly." (Gov. Code, § 11346.) In the NPLH Act, the Legislature expressly chose to "not . . . subject" to the APA the "guidelines or regulations," adopted by the Department, "as necessary to exercise the powers and perform the duties conferred or imposed on it by" the NPLH Act. Thus, the NPLH Act meets the APA's requirements for exempting from the APA the Department's development of regulations and guidelines to carry out its functions under the NPLH Act.

"The Legislature can freely amend or repeal a legislative statute." (*People v. Prado* (2020) 49 Cal.App.5th 480, 485.) Hence, the fact that the Legislature has opted to not apply a legislative statute to the NPLH Act is not, in and of itself, disallowed or even suspect. Indeed, when it enacted the APA, the Legislature used its policy-making prerogative to include language that left room for the option to exclude certain regulatory actions from the requirements of the APA. Despite this, Appellant argues "delegation of plenary rulemaking authority unconstrained by the Administrative Procedure Act is unconstitutional." (Capitalization removed.) In advancing her argument, Appellant essentially takes the novel position that exempting an agency's rule-making power from the APA is tantamount to a per se violation of the separation of powers doctrine because the mechanism for establishing the rules lacks sufficient safeguards.

The authority Appellant cites to further her argument does not support her position. Quite the contrary, that authority supports our conclusion that she is incorrect. To begin with, none of the cases Appellant cites actually states that the APA must be applied to agency rulemaking lest that rulemaking run afoul of constitutional mandates. Indeed, none of them even considers the direct question, and "[i]t is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th

18

1250, 1268 fn. 10.)  Yet even if one were to look to the authority Appellant cites to see if the analysis in them hints at the correctness of her position, they would look in vain.

One clear example of this is found in *Kugler v. Yocum, supra*, 69 Cal.2d at pages 373-374, in which our Supreme Court considered whether a proposed ordinance for the City of Alhambra that would command the city manager to set firefighters salaries based upon the salaries of firefighters in a neighboring city and county would "improperly delegate the council's legislative power."  The fact that the proposed ordinance would use a "formula [that] operates upon eventualities which may lie outside the control of the legislative body and within the control of other persons [did] not convert the legislative action into an unlawful delegation." (*Id.* at p. 377.)  The court reasoned, "[t]he proposed Alhambra ordinance contains built-in and automatic protections that serve as safeguards against exploitative consequences from the operation of the proposed ordinance." (*Id.* at p. 382.)  Those safeguards included, that the neighboring city and county would be "no more anxious to pay its firemen exorbitant compensation than" Alhambra, and that the neighboring city, "as an employer will be motivated to avoid the incurrence of an excessive wage scale; the interplay of competitive economic forces and bargaining power will tend to settle the wages at a realistic level." (*Ibid.*)  In short in *Kugler* the court decided that an ordinance that allowed local salaries to be determined largely by an entity not subject to the rules of the community that passed the ordinance contained sufficient safeguards to keep it from amounting to an impermissible delegation of power.  Moreover, the "safeguards" were not specific procedures--or even specific financial formulas--that the court could point to which the neighboring entities would use to set salaries.  Rather, those safeguards were that the neighboring city would be economically motivated to make practical decisions in setting their salaries.  The safeguards in place under the NPLH Act, including an advisory committee and required reports to the Legislature, provide adequate protections.

19

Appellant's argument regarding the "power of the purse" is equally flawed. It appears to be an unsupported argument that the ability of the Legislature to decide how to spend funds is particularly special, and, therefore, subject to a type of heightened need to satisfy the test for delegating decision making to another entity. But in *Kugler* we see the two-part standard applied to an ordinance that delegated a key component of establishing firemen salaries, a financial question, to another jurisdiction.

In adopting the NPLH Act, the Legislature and the electorate both (1) resolved fundamental policy issues, and (2) provided the Department and Authority with adequate direction to implement those policies.

C.      The NPLH Act Does Not Violate the Constitutional Prohibition Against a Gift of Public Funds

In her fifth cause of action, Appellant alleges that the NPLH Act violates the California Constitution's prohibition on the gift of public funds and, therefore, allows wasteful spending within the meaning of Code of Civil Procedure section 526a. We disagree.

Article XVI, section 6 of the California Constitution prohibits the gift of public funds to a private person. Code of Civil Procedure section 526a authorizes a taxpayer to bring an action to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency." " 'It is well settled that, in determining whether an appropriation of public funds or property is to be considered a gift, the primary question is whether the funds are to be used for a "public" or a "private" purpose. If they are for a "public purpose," they are not a gift within the meaning of section 31 of article IV. [Now § 6 of art. XVI.] [Citations omitted.] The benefit to the state from an expenditure for a "public purpose" is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom. [Citation omitted.] [para.] The determination of

20

what constitutes a public purpose is primarily a matter for legislative discretion [citations omitted], which is not disturbed by the courts so long as it has a reasonable basis. [Citations omitted.]' (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281 [ ], see also *California Housing Finance Agency v. Elliott[* (1976)] 17 Cal.3d 575, 583 [(*CHFA*)]; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 746 [ ], app. dism. 406 U.S. 913 [32 L.Ed.2d 112]; *Redevelopment Agency v. Shepard* (1977) 75 Cal.App.3d 453, 457 [ ].)  Moreover, '[the] concept of public purpose has been liberally construed by the courts, and the Legislature's determination will be upheld unless it is totally arbitrary.' (*Mannheim v. Superior Court* (1970) 3 Cal.3d 678, 691 [ ].)" (*Kizziah v. Department of Transportation* (1981) 121 Cal.App.3d 11, 22.)

Welfare and Institutions Code section 5849.1 summarizes the policies the Legislature considered when it adopted the NPLH Act.  It reflects a contemplation of the public good to be served by the NPLH Program, including potential financial benefits. Providing housing to mentally ill homeless persons is a public purpose.  (See *CHFA, supra,* 17 Cal.3d at p. 580 ["We have long recognized that the matter of public housing is one of great public concern and importance"].)

Appellant does not dispute that there is a public purpose to the NPLH Act. Instead, she argues that "enormous" public subsidies result from the loan payment terms developers would be obligated to satisfy, and that "[a] subsidy this enormous allows developers to make huge sums simply though investing the loans."  She also warns that "private corruption frequently hides behind an ostensible public purpose."

Though Appellant does cite to sections of the NPLH Act that establish various limits for loan terms, nowhere does she provide any sort of data to support that, compared to other financing schemes, these terms allow for "enormous" or atypical subsidies that would be tantamount to a windfall for private developers, which would expose the program to the influence of rank corruption.

21

Moreover, *CHFA, supra,* 17 Cal.3d at pages 583-584, which Appellant cites to support her argument, actually supports a conclusion that offering private developers the chance to build housing on terms they find financially favorable is not enough to eviscerate the public benefit secured by the NPLH Act. First, the court noted "considerable case law" that supported an agency's "contention that the Legislature acted reasonably in concluding that decent housing for the affected persons serves a public purpose." Then, the court described cases in which courts upheld (1) a sale of property from a public entity to a private entity at below market cost where only a portion of the property would be used for low-income housing (*id.* at p. 584 [citing *Winkelman v. City of Tiburon* (1973) 32 Cal.App.3d 834]), and (2) "the issuance of bonds to public entities for the purpose of making long-term, low-interest rate loans to private individuals for residential rehabilitation in depressed housing areas even though the dwellings might subsequently be made available to families without regard to income." (*Ibid.* [citing *Board of Supervisors v. Dolan* (1975) 45 Cal.App.3d 237]). Finally, the court dismissed efforts to meaningfully distinguish those cases from the facts in *CHFA* stating, "[w]hile no prior case approves a housing scheme containing the identical combination of elements involved in the program herein at issue, we discern and trace in these prior cases common threads of substantially equivalent public purposes and policies." (*CHFA, supra,* 17 Cal.3d at p. 584.) The NPLH Act does not, on its face, violate constitutional prohibitions on the gift of public funds.

We also find Appellant has not demonstrated the NPLH Act will lead to waste. " '[T]he term "waste" as used in section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion. To hold otherwise would invite constant harassment of city and county officers by disgruntled citizens and could seriously hamper our representative form of government at the local level. Thus, the courts should not take judicial cognizance of disputes which are primarily political in nature, nor should they attempt to enjoin every

22

expenditure which does not meet with a taxpayer's approval. On the other hand, a court must not close its eyes to wasteful, improvident and completely unnecessary public spending, merely because it is done in the exercise of a lawful power.' " (*Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138-1139 [quoting *City of Ceres v. City of Modesto* (1969) 274 Cal.App.3d 545, 556].) Here nothing suggests the proposed financing scheme is "improvident" or "completely unnecessary." Instead, the Legislative findings contained in Welfare and Institutions Code section 5849.1 suggest the Legislature and electorate determined that providing permanent supportive housing to persons who are mentally ill and homeless, or at risk of becoming homeless, is an important public need and the NPLH Program and attendant financing scheme provide a reasonably calculated means to advance that public purpose.

D.     The Validation Statutes Are Constitutionally Valid

In her third cause of action, Appellant raises four arguments that the validation statutes violate constitutional protections of due process, equal protection, and the separation of powers. None of Appellant's arguments are persuasive.

Welfare and Institutions Code section 5849.13 states that, "[a]n action to determine the validity of any contract or loan authorized pursuant to Section 5849.35 or of any bond authorized to be issued pursuant to Section 15463 of the Government Code, and any contracts related to those bonds, may be brought in accordance with Section 17700 of the Government Code." Government Code section 17700 provides that, "[t]he state or any state board, department, agency, or authority . . . may bring an action to determine the validity of its bonds, warrants, contracts, obligations, or evidences of indebtedness pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure."

Code of Civil Procedure section 860 enables a public agency to bring an action to determine the validity of "any matter which under any other law is authorized to be

23

determined pursuant to this chapter" within 60 days of the existence of the law or matter to be validated. Pursuant to Code of Civil Procedure section 864, "bonds, warrants, contracts, obligations, and evidences of indebtedness shall be deemed to be in existence upon their authorization. Bonds and warrants shall be deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance authorizing their issuance, and contracts shall be deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance approving the contract and authorizing its execution."

Code of Civil Procedure section 861 provides that, "[j]urisdiction of all interested parties" to a validation action, "may be had by publication of summons pursuant to Section 6063 of the Government Code in a newspaper of general circulation designated by the court, published in the county where the action is pending and whenever possible within the boundaries of the public agency, and in such other counties as may be ordered by the court, and if there be no such newspaper in any such county or counties then in some adjoining county. In addition, prior to completion of such publication, the agency shall, to the extent which the court finds reasonably practicable, give notice of the pendency of the proceeding by mail or other means ordered by the court." According to Code of Civil Procedure section 861.1, a summons in a validation action, "shall be directed to 'all persons interested in the matter of [specifying the matter],' and shall contain a notice to all persons interested in the matter that they may contest the legality or validity of the matter by appearing and filing a written answer to the complaint not later than the date specified in the summons, which date shall be 10 or more days after the completion of publication of the summons." Also, "[t]he summons shall provide a detailed summary of the matter the public agency or other person seeks to validate." (Code Civ. Proc., § 861.1.)

Under, Code of Civil Procedure section 863, "[i]f no proceedings have been brought by the public agency pursuant to this chapter, any interested person may bring an

24

action within the time and in the court specified by Section 860 to determine the validity of such matter." As a result, "[u]nder the statutory scheme, 'an agency may indirectly but effectively "validate" its action by doing nothing to validate it; unless an "interested person" brings an action of his own under section 863 within the 60-day period, the agency's action will become immune from attack whether it is legally valid or not.' (*City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 341–342 [ ]; accord, *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 851 [ ] (*Friedland*); *Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 792 [ ].) As to matters 'which have been or which could have been adjudicated in a validation action, such matters—including constitutional challenges—must be raised within the statutory limitations period in section 860 et seq. or they are waived.' (*Friedland*, *supra*, at pp. 846–847.)" (*California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1420 (*California Commerce*).)

A judgment in a validation action, "if no appeal is taken, or if taken and the judgment is affirmed, shall . . . thereupon become and thereafter be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the agency and against all other persons, and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive." (Code. Civ. Proc., § 870, subd. (a).)

Appellant argues that the notice provisions of the validation statutes, particularly those that allow for notice by publication in a newspaper, violate due process. She concludes that, because of this, Government Code section 17700, "should be struck as unconstitutional." We disagree.

Appellant cites *Mullane v. Central Hanover Trust* (1950) 339 U.S. 306, 315, 314 for the propositions that (1) "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated,

under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" (*Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873]); and (2) when notice is what is due to an interested party, "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Appellant then argues that "in modern times" newspaper publication, without additional postings to "appropriate websites" is not a reasonable means to accomplish publication. We disagree. We see no reason to assume that the existence of the means of publication Appellant proposes--particularly given that Appellant has provided no admissible evidence or controlling authority that supports her position--renders publication by newspaper not reasonably likely to reach interested parties.

Additionally, Code of Civil Procedure section 861, upon which Appellant rests her argument that we must strike the whole of Government Code section 17770, does not foreclose the use of other forms of notice when appropriate. In fact, it states that an agency "*shall . . .* give notice of the pendency of the proceeding by mail or other means ordered by the court" when the court finds it is reasonably practicable for it to do so. (Italics added.) Far from mandating a form notice that violates due process, Code of Civil Procedure section 861 was crafted in such a way to ensure that courts can direct agencies to use alternate means of notice when better means are available. As such, the statute does not run afoul of due process principles that govern judicial notice.

Appellant's next argument focuses on the amount of time the validation statutes provide for interested persons to respond to a notice of an action. She argues that that, in providing only 10 days to respond to a validation action when defendants in other actions get 30 days, the validation procedures discriminate between two similarly situated groups in violation of Equal Protection.

Both the U.S. and California constitutions include equal protection guarantees. The U.S. Constitution provides, "[n]o State shall . . . deny to any person within its

26

jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.) Similarly, article I, section 7, subdivision (a) of the California Constitution provides: "A person may not be . . . denied equal protection of the laws . . . ." These guarantees are "essentially a direction that all persons similarly situated should be treated alike." (See *City of Cleburne v. Cleburne Living Ctr.* (1985) 473 U.S. 432, 439.)

An equal protection claim has two essential elements: " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) "If such a classification of similarly situated individuals exists, a court must next ascertain whether the Legislature has a constitutionally sufficient reason to treat the groups differently. [Citations.] Unless the groups are defined by word or effect as members of a 'suspect classification' (such as race, national origin or gender) or the law affects a fundamental right (such as the right to vote or the right to marry), a law will be upheld as long as there is any 'rational relationship between a disparity in treatment and some legitimate governmental purpose.' [Citations.] ' "This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.' " [Citation.] . . . If a plausible basis exists for the disparity, courts may not second-guess its " 'wisdom, fairness, or logic.' " ' [Citations.]" (*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1108-1109, review granted Nov. 13, 2019, S258175.)

Here, Appellant identifies the "similarly situated groups at issue for Equal Protection purposes" as "defendants in validation actions, and defendants in all other actions." Appellant also maintains that "[b]ecause this case involves the mentally ill, the federal standard of review is heightened rationality," but this is a false dichotomy. Persons who are mentally ill are not treated in an unequal manner as compared to other litigants under either the validation statutes or statutes applying to response times in other actions. Thus, we apply a rational basis test.

*California Commerce, supra,* 146 Cal.App.4th at pages 1419-1421, though not directly on point is instructive here. In *California Commerce*, the Second District Court of Appeal discussed the policy decisions that prompted the Legislature to adopt certain procedural requirements for validation actions: "We recognize the statutory period of limitation for commencing a validation action is extremely short but it is not unique in its brevity. [Citation.] 'What constitutes a reasonable time is a question ordinarily left to the Legislature, whose decision a court will not overrule except where palpable error has been committed. [Citation.]' [Citation.] Given the policies underlying the validation statutes, including the need to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially, the 60-day limitations period for filing a validation action (Code Civ. Proc., § 860) is not unreasonable. [Citation.] [¶] A validation action implements important policy considerations. ' "[A] central theme in the validating procedures is speedy determination of the validity of the public agency's action." [Citation.] "The text of [Code of Civil Procedure] section 870 and cases which have interpreted the validation statutes have placed great importance on the need for a single dispositive final judgment." [Citation.] The validating statutes should be construed so as to uphold their purpose, i.e., "the acting agency's need to settle promptly all questions about the validity of its action." [Citation.] [¶] . . . [¶] A key objective of a validation action is to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially. [Citation.]' [Citation.]" (*Id.* at pp. 1420-1421, fn.

28

omitted.)  Here the same rational basis--the need to speedily resolve the validity of a public agency's actions, particularly where irresolution can tie up financial matters--justifies the Legislature's decision to subject those who plan to respond to validation actions to a shorter response time than defendants and respondents in other proceedings. The response times contained in validation statutes in general, and as applied to the NPLH Program, do not violate state and federal guarantees of equal protection.

Appellant argues validation statutes violate the Separation of Powers doctrine because they allow for advisory opinions.  Appellant reasons that because judgments in validation actions, including default judgments where no one actively disputes the validation, will "permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive," (see Civ. Proc. Code, § 870, subd. (a)) the validation statutes allow for impermissible advisory opinions.

*Santa Monica, supra,* 126 Cal.App.4th 43, which Appellant relies on as the central authority to support her argument, demonstrates why her position is wrong.  In *Santa Monica*, *supra*, 126 Cal.App.4th at pages 59 and 63, the Second District Court of Appeal addresses the importance of "ripeness" in determining if a controversy is justiciable.  The court observed, "[r]ipeness is aimed at 'prevent[ing] courts from issuing purely advisory opinions. [Citation.]  It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of . . . opinion.  It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes.  However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.' [Citation.]" (*Id.* at pp. 63-64.)

29

*Santa Monica*, *supra*, 126 Cal.App.4th at page 64, sets out a two-pronged test for determining ripeness: "(1) whether the dispute is sufficiently concrete so that declaratory relief is appropriate; and (2) whether the parties will suffer hardship if judicial consideration is withheld. (*Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 501–502 [ ] (*Farm Sanctuary, Inc.*).) 'Under the first prong, the courts will decline to adjudicate a dispute if "the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues["] [citation], if the court is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a "contrived inquiry [citation]." Under the second prong, the courts will not intervene merely to settle a difference of opinion; there must be an imminent and significant hardship inherent in further delay.' (*Id.* at p. 502.)"

Validation actions brought under the validation statutes satisfy both prongs of the *Santa Monica* test. First, the validation statutes allow a government entity to determine the validity of a matter--e.g., law, bond, contract, or obligation--"upon the existence" of the matter. (Code Civ. Proc., §§ 860 & 864.) In order for bonds or contracts to be considered in existence, there must be a resolution or ordinance adopted by a governing body approving them and, where applicable, authorizing their execution. (Code Civ. Proc., § 864.) Their issuance and terms have crossed from being hypothetical possibilities and subject to further debate by the governing body, into imminent actions directed by the governing body. In this scenario, the court is not asked to consider laws that *might* be passed and/or obligations that *might* be authorized, it is asked to consider about laws that have been passed and obligations that have been approved. Thus, the facts--i.e., the scope of the law or obligation at issue--is not hypothetical. Also, as discussed in section 2, above, there is a real need for public agencies to have potential disputes about these real laws and obligations settled promptly in order to carry on with their business.

The validation statutes do not violate the separation of powers doctrine.

30

As a final effort to persuade us that the validation statutes are unconstitutional, at least as set out in the NPLH Act, Appellant argues the 60-day statute of limitations contained in them is "hidden" and violates due process and protections of the separation of powers due to their failure to provide persons who may wish to file reverse validation actions a reasonable amount of time to file this action. Again, we disagree.

For the reasons articulated in section 3, above, the validation statutes in general, and as included here, represent a reasonable Legislative decision to have potential challenges to agency actions resolved quickly, so that the agency can move forward with confidence and firm knowledge of their financial standing. Additionally, the use of those procedures is not "hidden" here. Though one may need to follow cross-references to other statutes to find the specific procedural requirements, those references are not so convoluted as to render them unreasonable and are contained in short statutes that make the subject of them--where to look to determine how to proceed in a legal challenge--easy to find. (See Welf. & Inst. Code, § 5849.13 [indicating actions to challenge agreements and obligations entered into under Welf. & Inst. Code, § 5849.35 may be brought in accordance with Gov. Code, § 17700]; Gov. Code, § 17700 [indicating state entities can bring actions to determine the validity of various identified obligations pursuant to the validations statutes contained in "Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure"].)

## III

### *The Trial Court Properly Granted the Respondents' Validation Request*

Attached to the Respondents' complaint was a copy of Resolution No. 2017-05, which was adopted by the Authority on August 24, 2017. The resolution authorizes the issuance of up to $2 billion in bonds pursuant to the NPLH Act. It also approved a master indenture, a supplemental indenture, a loan agreement, and service contract "in substantially the forms on file with the Authority prior to" the meeting at which the

31

resolution was adopted. Also attached to the complaint was an approval form signed by the Department Director, in which he approves the loan agreement and service contracts adopted by the Authority in its August 24, 2017, resolution. Unexecuted copies of the master indenture, a form of supplemental indenture, the loan agreement, and service contract, with items like dates of entry left to be filled in, were attached to a declaration submitted by the Authority's director in support of the trial brief the Respondents filed below.

Newspapers published Respondents' summons on October 27, 2017; November 3, 2017; and November 10, 2017. In all caps, the summons indicated it was directed to "all persons interested in the matter of the validity of the revenue bonds the California Health Facilities Financing Authority has authorized to be issued and sold under the No Place Like Home Act for the purpose of funding the development and preservation of permanent supportive housing for persons living with a severe mental illness and who are homeless, chronically homeless, or at risk of chronic homelessness, and certain proceedings and matters related thereto." The summons indicated the noticed persons could contest the legality or validity of the matter by filing a response in and appearing in the court. The summons gave persons until November 27, 2017, to respond. It indicated that the "voters enacted" the MHSA in 2004, and in July 2016 the Legislature amended MHSA to establish the NPLH Program. It indicated the NPLH Program "dedicates $2 billion in bond proceeds, to be repaid by Mental Health Services Act funding, to invest in developing and preserving permanent supportive housing for persons living with a severe mental illness and who are homeless, chronically homeless, or at risk of chronic homelessness." It then summarized the contents of the Authority's resolution, identifying the resolution by number and date of adoption, and the approval of the Department director. It listed the matters the Respondents sought to validate with their validation action. It provided the address of the court and Respondents' counsel.

32

Appellant argues that the summons issued by the State respondents was not sufficiently detailed and, thus, that the superior court lacked jurisdiction to decide the validation action.

"When jurisdiction is obtained by a prescribed form of constructive notice, the statutory conditions upon which service depends must be strictly construed; there must be strict compliance with the mode prescribed in the statute. Conformance with the statute is deemed jurisdictional and absence thereof deprives the court in the particular action of power to render a judgment." (*Eagle Electric Mfg. Co. v. Keener* (1966) 247 Cal.App.2d 246, 250-251.)

Here, Appellant argues that the summons in the validation actions failed to comply with Code of Civil Procedure section 861's directive that it include "a detailed summary of the matter the public agency or other person seeks to validate," because it did not mention that "Prop. 63 funds are being shifted to uses the Voters did not originally approve" or Appellant's action challenging the NPLH Act. Appellant takes the position that the way the summons was worded suggests the transfer of funds being made was consistent with the voters' intent when they passed Proposition 63.

We do not agree with Appellant's suggestion that Respondents were obligated to clearly state that persons might argue--and had argued--that the proposed actions under the NPLH Act were contrary to the intent of the MHSA. The summons indicates that the NPLH Act was an amendment to the MHSA and would use MHSA funding to repay bonds. Inherent in the nature of the summons inviting the public to challenge the legality or validity of the proposed actions is the suggestion that the propriety of those proposed actions might be subject to some dispute. Here, the Respondents provided a sufficient road map to where potentially interested parties might look to determine if there was a legal conflict. Respondents were not obligated to present every likely basis for a challenge.

33

Appellant argues the validation complaint improperly sought to validate draft documents. This position ignores the plain language of the validation statutes. Code of Civil Procedure section 864 specifies that "bonds, warrants, contracts, obligations, and evidences of indebtedness shall be deemed to be in existence upon their authorization. *Bonds and warrants shall be deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance authorizing their issuance, and contracts shall be deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance approving the contract and authorizing its execution.*" (Italics added.) Here, the applicable authorizations and approvals were entered before the action was filed and submitted to the court. The court was then provided copies of the indentures and agreements of which the resolution and approval authorized the entry and execution. The blanks would be filled in and signatures obtained once the court validated the Authority's and Department's decision to execute the documents.

## DISPOSITION

The judgment is affirmed.

 

HULL, J.

We concur:

RAYE, P. J.

BLEASE, J.

34